UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID MATIELLA,

                              Plaintiff,

              - against -

DIRECTV, INC.,

                              Defendant.

11 Civ. 02458 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

On March 7, 2011, plaintiff David Matiella ("Matiella") commenced this action against defendant DIRECTV in the New York Supreme Court for the County of New York alleging breach of contract and tortious interference with contract under state law.  Matiella's complaint alleges that DIRECTV wrongfully prohibited him from exercising certain stock options he earned during his career with Hughes Electronics Corporation ("HEC"), a wholly owned subsidiary of General Motors ("GM") that DIRECTV later acquired.  On April 11, 2011, DIRECTV filed a Notice of Removal pursuant to 28 U.S.C. § 1446 to remove the action to this Court on the ground that Matiella's state law claims were preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Matiella now moves to remand the action to state court, and DIRECTV cross moves to dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, Matiella's motion to remand is GRANTED, and DIRECTV's motion to dismiss is DENIED.

**BACKGROUND**

The following facts are taken from Matiella's complaint, the documents attached to his complaint, and the documents specifically referenced in his complaint.

In 2000, Matiella, a United States citizen currently residing and domiciled in Mexico, was employed as an executive with GM. (Compl. ¶¶ 1, 3; Decl. of David Matiella ¶ 1.)  In October 2000, GM transferred Matiella to work for GM's wholly owned subsidiary, HEC. (Compl. ¶ 4.)  HEC in turn assigned Matiella to work for its subsidiary Directv Latin America ("DTVLA"), where Matiella worked until his retirement on April 1, 2002. (*See* Compl. ¶¶ 5-6.)

On November 1, 2000, while Matiella was working for DTVLA, HEC awarded him stock options pursuant to the terms of a plan known as the HEC Incentive Plan. (Compl. ¶¶ 7-8.)  The options gave Matiella the right to purchase 20,000 shares of General Motors/Hughes ("GMH") stock at a total exercise price of $32,105. (Compl. ¶ 7.)  Under the terms of the grant, the options were exercisable until November 2, 2010. (*Id.*)  The HEC Incentive Plan, however, provided that the exercise period could be cut short if an employee terminated his employment with HEC. Specifically, the HEC Incentive Plan provided that if an employee terminated his employment

> (voluntarily or involuntarily) at any time on or after the first anniversary of
> the date of grant of an option for any reason other than death or dismissal
> for cause, or voluntary termination without the consent of Hughes, then,
> *unless the GM Committee determines otherwise*, the option will terminate
> not later than the fifth anniversary . . . of the date of termination of
> employment or, if earlier, the expiration date of the option.

(Compl. ¶ 9 (emphasis added).)

In 2002, GM announced a program known as the 2002 U.S.-Wide Window Retirement Program (the "Window Program"). (*See* 2002 U.S.-Wide Window Retirement Program (Window) Information for Executive Candidates (SERP Eligible) ("Window Program"), 1 (attached as Ex. 1 to Decl. of Thomas L. Follosco ("Follosco Decl.") (the Follosco Decl. is

attached as Ex. C to DIRECTV's Notice of Removal)).)  The Window Program was designed to provide an incentive to retire for certain eligible executives between the ages of fifty and sixty-one. (Compl. ¶ 11.)  To provide the incentive, the Window Program offered eligible executives a variety of early retirement benefits.  According to an information sheet provided by GM, the Window Program offered participating executives the opportunity to receive Salaried Retirement Program benefits and health care benefits that would not be reduced for age. (*See* Window Program, 1, 3.)  The Window Program also provided participants "Supplemental Life Benefits Program (SLBP) coverage and Personal Umbrella Liability Insurance (PULI) . . . during retirement." (*Id.* at 3.)  The Window Program also offered eligible executives benefits related to stock options.  For example, the Window Program provided that retiring executives could retain the first installment of any stock options granted in 2002. (*Id.* at 3.)  The Program also provided that stock options granted on or after January 1, 1999 would remain exercisable until their original expiration date. (*Id.* at 3.)  Matiella alleges that this provision applied to his stock options and that therefore his stock options remained exercisable until November 2, 2010, their original expiration date. (*Id.* ¶¶ 12-13.)   The information sheet also provided,

> This Window is governed by provisions of the Employee Retirement Income Security Act of 1974 (ERISA) and the Internal Revenue Code (IRC).  The Named Fiduciary with respect to GM Benefit Plans, exclusive of the Investment of such plan's assets, is the Investment Funds Committee of the Board of Directors of General Motors Corporation.  The Plan Administrator is General Motors Corporation.

(*Id.* at 4.)  The program required all retirements under the Window Program to become effective on April 1, 2002. (*Id.* at 1.)

Matiella was eligible to retire under the Window Program, and he chose to do so. (Compl. ¶ 15.)  His retirement became effective on April 1, 2002. (*Id.*)  In 2003, DIRECTV

acquired HEC and assumed GM and HEC's liability with respect to certain employee benefits, including those accrued under the HEC Incentive Plan and the Window Program. (*Id.* ¶ 17.)

In May 2010, Matiella contacted a broker at Morgan Stanley Smith Barney to arrange for the exercise of his stock options. (*Id.* ¶ 18.)  DIRECTV, however, intervened and cancelled the transaction. (*Id.* ¶ 21.)  In an email to Matiella, DIRECTV explained that it cancelled the transaction because, under both its and GM's interpretation of the Window Program, Matiella's General Motors/Hughes stock options had expired on April 1, 2007, five years after Matiella's retirement. (*See* Compl. Ex. A.)  DIRECTV explained that the provision in the Window Program providing that stock options acquired on or after January 1, 1999 would be exercisable until their original expiration date did not apply to General Motors/Hughes stock options, and instead only applied to certain other General Motors stock options which Matiella did not own. (*Id.*) DIRECTV thus refused to permit Matiella to exercise the stock options.  Matiella subsequently brought this action, alleging that DIRECTV's conduct amounted to a breach of contract and also that DIRECTV tortiously interfered with a contract between Matiella and Morgan Stanley relating to the exercise of the options.

## LEGAL STANDARD

### I.        Motion to Remand

Removal of a case is only appropriate if the federal district court would have original subject matter jurisdiction over the action. 28 U.S.C. § 1441(a).  The case must be remanded if the federal court lacks subject matter jurisdiction over the action. *Id.* § 1447(c).  DIRECTV's primary basis for removal is that federal question jurisdiction exists, i.e., that this action "aris[es] under the Constitution, laws, or treaties of the United States." *Id.* §§ 1331, 1441(b).  (*See* Notice of Removal, ¶ 4.)

Federal question jurisdiction exists only if a question of federal law is raised by petitioner's "well pleaded complaint." *See, e.g.*, *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (citing *Gully v. First Nat'l Bank*, 299 U.S. 109 (1936)). Under the "well pleaded complaint" requirement, subject matter jurisdiction is only available if the federal question is an essential element of a plaintiff's cause of action. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust For S. Cal.*, 463 U.S. 1, 10-11 (1983) ("'[A] right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.'" (quoting *Gully*, 299 U.S. at 112)). Consequently, it is well established that a federal issue raised by a defendant's anticipated defense—including preemption—ordinarily does not create federal question jurisdiction. *See, e.g.*, *id.* at 14 ("[S]ince 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption . . . even if both parties admit that the defense is the only question truly at issue in the case."); *Metro. Life*, 481 U.S. at 63 ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court.").

Nonetheless, a claim pleaded in terms of state law will be considered a federal cause of action when "complete preemption" applies. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393-99 (1987) (describing "complete preemption" doctrine and applying it in the context of § 301 of Labor Management Relations Act ("LMRA")). The doctrine of complete preemption is a corollary to the well-pleaded complaint rule which recognizes that "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life*, 481 U.S. at 63-64. Therefore, a federal statute with

"extraordinary pre-emptive power" can "convert[ ] an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* at 65; *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004) ("'[W]hen a federal statute wholly displaces the state-law cause of action through complete preemption,' the state claim can be removed . . . because . . . 'a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.'" (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003))).

In *Metropolitan Life Insurance Co. v. Taylor*, the U.S. Supreme Court held that ERISA's civil enforcement provision, § 502(a), is a provision with the "extraordinary pre-emptive power" required to transform a state law claim to a federal claim. *Taylor*, 481 U.S. at 65. The Court noted that it was "reluctant" to do so, even recognizing the "unique pre-emptive force of ERISA," but based its decision on the fact that Congress had "clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court." *Id.* at 65-66. Following *Metropolitan Life*, the Second Circuit has developed the following test:  "a state-law cause of action arises under federal law . . . and is removable . . . if (1) the cause of action is based on a state law that is preempted by ERISA, and (2) the cause of action is 'within the scope of the civil enforcement provisions' of ERISA § 502(a)." *Romney v. Lin*, 94 F.3d 74, 78 (2d Cir.1996).

## II.    Motion to Dismiss

"Courts ruling on motions to dismiss must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Dickerson v. Mut. of Am.*, 703 F. Supp. 2d 283, 290 (S.D.N.Y. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

### A.  ERISA Preemption

DIRECTV argues that removal here was proper, and that Matiella's claims must be dismissed, because Matiella has brought only state law claims that are completely preempted by ERISA.  Matiella, for his part, argues that removal was improper, and that his motion to remand must be granted, because his state law claims are *not* preempted by ERISA.  Accordingly, if Matiella's claims are preempted by ERISA, DIRECTV's removal was proper[1] and its motion to dismiss must be granted.  By contrast, if Matiella's claims are not preempted, his motion to remand must be granted.

Section 514(a) of ERISA provides that it "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan" covered by the statute.  29 U.S.C. § 1144(a).

---

[1] With respect to the second prong of the test articulated in *Romney* for determining whether removal based on complete preemption is proper—i.e. whether "the cause of action is 'within the scope of the civil enforcement provisions' of ERISA § 502(a)," *Romney*, 94 F.3d at 78—Matiella's claims plainly satisfy that prong, provided his claims relate to an ERISA plan.  Section 502(a) of ERISA authorizes suits "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(1)(B).  Accordingly, the only issue is whether Matiella's "cause of action is based on a state law that is preempted by ERISA." *Romney*, 94 F.3d at 78.

The purpose of ERISA's "expansive pre-emption provision[]" is "to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). Indeed, ERISA's uniform system of regulation is intended to "simplify[] life for employers administering plans in several states, because '[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation.'" *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 113 (2d Cir. 2008) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987)). Accordingly, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Davila*, 542 U.S. at 209.

Matiella argues that his claims are not preempted because they do not "relate to" an "employee benefit plan" within the meaning of ERISA. Matiella argues that the Window Program was not an "employee benefit plan," but rather "a group of separate independent promises" that, in Matiella's case, modified the existing HEC Incentive Plan, under which Matiella's stock options originally had been granted. (Mem. of Law in Supp. of Pl.'s Mot. for Remand, 9.) As such, Matiella argues that his claims relate to the HEC Incentive Plan, which neither party asserts is an ERISA plan, rather than to any ERISA-governed plan.

The Window Program provides for a variety of early retirement benefits, nearly all of which are defined with reference to other GM benefit programs already in existence. For example, the Program refers to GM's Salaried Retirement Program (SRP) and Regular Formula SERP benefits, and provides the added benefit that participating executives' payments under those programs will not be reduced because of the participants' younger retirement ages. The

Window Program also offers Supplemental Life Insurance Benefits Program coverage and permits participating executives to keep their savings in an already existing Savings-Stock Purchase Program.  The Window Program also provides, "All benefits and incentive compensation treatment provisions described below are subject to the terms of all applicable plans," and "retiring executives are subject to meeting the conditions precedent of the incentive compensation plans." (Window Program, 3-4.)

Faced with a similar early retirement program, the Court of Appeals for the Eighth Circuit has stated,

> [I]n dealing with a multi-faceted employment contract such as [the employer] NCR's early retirement Program, some facets may be governed by ERISA (such as the Program's promise of enhanced pension benefits), while others may be governed by state law (such as NCR's promises to pay $30,000 in additional salary in 1993 and vacation pay in 1994.  If a facet is governed by ERISA, any dispute over the terms of *that benefit* must be resolved by looking to ERISA's statutory provisions and relevant case law.

*Stearns v. NCR Corp.*, 297 F.3d 706, 710 (8th Cir. 2002).  Much like the Window Program here, the early retirement program in *Stearns*

> offered a collage of financial benefits, including a $30,000 lump sum payment added to their 1993 salaries, paid vacation time in 1994, pension benefits calculated without a reduction for early retirement, enhanced life insurance coverage, and . . . eligibility for more favorable retirement health care benefits than were available under NCR's existing retirement health care plans.

*Id.* at 709.  The court went on to hold that NCR's early retirement Program was not a "free-standing" ERISA plan because the documents that described the early retirement Program were "not sufficient to explain the retirement health care benefits being offered." *Id.* at 711.  Instead, a full explanation of the Program's benefits could be made only with "reference to the detailed benefit provisions in the existing Group Benefits Plan." *Id.*  Thus, the court concluded that the

Program "was an amendment to existing employee benefit plans," rather than an independent ERISA plan. *Id.*

The situation here is similar.  The majority of benefits offered in the Window Program cannot fully be understood without reference to the terms of separate, pre-existing benefit plans. It thus is difficult to say that the "multi-faceted" Window Program, standing alone, is a distinct ERISA plan that implicates preemption anytime a participant seeks to enforce one of its provisions.

Indeed, the Supreme Court has recognized that an "employee benefit plan," 29 U.S.C. § 1002(3), within the meaning of ERISA refers to a program that provides "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987).[2]  In assessing whether an employer's program requires an "ongoing administrative program," the Second Circuit (and others) have identified a variety of factors to be considered, "including whether the employer's undertaking or obligation requires managerial discretion in its administration, whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits, and whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir. 1996) (internal citations omitted); *see Rodowicz v. Mass. Mut. Life Ins. Co.*, 192 F.3d 162, 171 (1st Cir. 1999) (identifying "long-term financial commitment[s]" to employees and "individualized determinations . . . over an extended period of

---

[2] The ERISA statute itself defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).  The statute in turn defines an "employee pension benefit plan" as "any plan, fund, or program . . . established or maintained by an employer . . . that by its express terms or as a result of surrounding circumstances . . . provides retirement income to employees." *Id.* § 1002(2)(A)(i).  An employee welfare benefit plan is defined as any plan "maintained for the purpose of providing . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs." *Id.* § 1002(1).

time" as indicators of an ERISA plan); *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir.

1992).  By contrast, a program that offers only "a one-time, lump-sum payment triggered by a

single event requires no administrative scheme whatsoever to meet the employer's obligation,"

and thus is not an "employee benefit plan" within the scope of ERISA. *Fort Halifax*, 482 U.S. at

11; *see also James v. Fleet/Norstar Fin. Group Inc.*, 992 F.2d 463, 467 (2d Cir. 1993) (benefits

whose provision requires only "simple arithmetical calculations" do not require an ongoing

administrative scheme).

The Window Program, standing alone, does not fit within *Fort Halifax*'s definition of an

"employee benefit plan."  Nearly all of the benefits provided in the Window Program are defined

with reference to separate, existing GM benefit plans.  The Window Program simply allows

participants to receive those benefits earlier than they otherwise would or to maintain them in

retirement.  For example, the Window Program provides participants with "Salaried Retirement

Program" benefits unreduced for age, "Regular Formula SERP benefits" unreduced for age, and

Supplemental Life Benefits Program coverage.  The Window Program also permits retiring

executives to leave their savings in an existing "Savings-Stock Purchase Program," and to

participate pro rata in GM's "Stock Performance Program" in 2002.  The only action seemingly

required to administer the Window Program is to notify the administrators of the *other* plans that

the individual is participating in the Window Program and that he or she therefore is entitled to a

benefit, calculated mechanically, in the other plan.  This obligation would be completed on the

date the participating employees retire, and that date is the same for all participating employees.

These limited administrative obligations seem to "require[] little in the way of administrative

burden or expense." *Rodowicz*, 192 F.3d at 171.  Thus, it can hardly be said that the Window

Program itself requires an "ongoing administrative program," *Fort Halifax*, 482 U.S. at 11, that

evidences "a long-term financial commitment," *Rodowicz*, 192 F.3d at 171, to employees apart from the plans and programs by which the Window Program's benefits are measured. *See Stearns*, 297 F.3d at 711; *see also O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262, 269-70 (1st Cir. 2001) (considering whether a pension credit in a multi-faceted early retirement program brought the program itself under ERISA and rejecting the argument that "the pension credit implicated ERISA because [the employer] would be obligated to pay '[a]s long as pension eligible participants in the [early retirement program] are alive" because the employer's "obligation to pay its employees a pension arose under a different retirement plan (undoubtedly covered by ERISA)").

The Window Program, of course, does appear to give some discretion to management in determining employee eligibility.  For example, the Window Program provides that "[t]he Executive Director Global Compensation and Corporate Governance Staff has the final decision with respect to SERP eligibility," and "[a]pproved candidates who accept an offer to retire under the provisions of this Window must maintain satisfactory performance for as long as they remain employed by GM." (Window Program 1-2.)   That the Window Program afforded GM some measure of discretion does not necessarily mean that the Program is an ERISA plan. *See Rodowicz*, 192 F.3d at 171-72 (finding that a voluntary termination program was not an ERISA plan where the administrator had discretion to exclude from participation in the program "employees who had been terminated 'for any reason or no reason at all,'" where the employer had discretion to defer participating employees' separation dates, and where the plan provided for an appeals process for "disappointed employees").  Moreover, these discretionary provisions endure only for the few months between the announcement of the Window Program and the effective date of the participants' retirement, and as such, would "not require the administrator to

12

make exclusive determinations over an extended period of time." *Id.* at 171. *Compare Schonholz*, 87 F.3d at 76-77 (finding that a severance plan evidenced an ongoing commitment because it "was not limited either to a single payment or to a short span of time upon a plant or office closing" and its "effective period was unlimited and would have reasonably been perceived by an employee as an ongoing commitment").

Finally, while the Window Program does state that "[t]his Window is governed by provisions of the Employee Retirement Income Security Act," (Window Program 4), the nature of the Window Program indicates that GM's intent with respect to the Window Program is not as clear as this provision makes it seem at first blush.  The Window Program makes clear that "[a]ll benefits and incentive compensation treatment provisions . . . are subject to the terms of all applicable plans," and "[a]ll retiring executives are subject to meeting the conditions precedent of the incentive compensation plans." (*Id.* at 3-4.)  The Window Program also refers readers to other GM booklets for explanations of their rights under ERISA and under the other GM benefit programs. (*Id.* at 4.)  These provisions indicate that GM "did not intend [the Window Program] to replace its pre-existing plan documents.  Instead, the [Window Program] appears to have been intended only to offer an early retirement incentive and to sketch how an employee's acceptance would affect those other benefits." *O'Connor*, 251 F.3d at 268.  As such, "the careful attention to avoid any appearance that the early retirement incentive overrode the prior benefit plans, and the evidence that it was designed to be a short-term program, suggests that [GM] did not intend [the Window Program] to be an ERISA plan." *Id.* at 272.  Accordingly, GM's intent with respect to the Window Program is somewhat ambiguous, and therefore cannot "outweigh the non-ERISA nature" of the substance of the Program. *Id.*

13

At bottom, the Window Program most reasonably appears as a "one-time, lump-sum," *Fort Halifax*, 482 U.S. at 11, grant of "mechanical," *O'Connor*, 251 F.3d at 271, enhancements to existing benefit plans, and as such, does not constitute a stand-alone ERISA plan. *See O'Connor*, 251 F.3d at 271 (finding a program that offered a severance benefit, pension credit, educational credit, and COBRA coverage not to amount to freestanding ERISA plan).

This does not mean, however, that Matiella's claim necessarily falls outside of ERISA's coverage.  Even though the Window Program itself is not a freestanding ERISA plan, Matiella's claim still may be subject to ERISA if the benefit he seeks to enforce is part of a separate ERISA plan. *See Stearns*, 297 F.3d at 710.  In *Balestracci v. NSTAR Electric & Gas Corp.*, 449 F.3d 224 (1st Cir. 2006), for example, the plaintiffs participated in an early retirement program ("ERP") that extended lifetime dental coverage to them provided that they pay 10% of the premium until age sixty-two, at which time the company would pay 100% of the premium. *Id.* at 226-27. Dental benefits were provided to regular retirees pursuant to an ERISA-governed medical plan. *See id.* at 226.  When the defendant employer announced it would be discontinuing dental benefits at age sixty-five, the early-retiree plaintiffs sued, arguing that the defendant had breached the terms of the ERP. *Id.* at 227-28.  The First Circuit held that ERISA applied to the plaintiffs' claims, even though the First Circuit in *O'Connor* previously had held that ERISA did *not* apply to the claims of the plaintiffs in that case for severance pay provided pursuant to the same early retirement program. *Id.* at 228-29.  The court stated,

> Whether the ERPs themselves constitute ERISA plans, or whether they concern preexisting ERISA welfare benefits, is beside the point.  The plaintiffs' claims are about dental benefits under an ERISA plan and ERISA. . . .  That the aspect of the ERPs at issue in *O'Connor*, the severance payment, was found to be not enforceable under ERISA does not make the retirement dental benefits at issue here similarly unenforceable under ERISA.

*Id.* at 229.

14

Accordingly, it is appropriate to examine ERISA's applicability to—and thus its preemptive effect on—a plaintiff's claim by examining the specific benefit provision in the Window Program that the plaintiff seeks to enforce.  In this case, the only provision of the Window Program Matiella seeks to enforce is the one that provides, "Options granted on or after January 1, 1999 will be exercisable until the option expiration date."  Matiella claims this provision validly amended the HEC Incentive Plan for Window Program participants.  ERISA's applicability to Matiella's claim thus depends in large part on whether the HEC Incentive Plan is an ERISA governed employee benefit plan.

Though neither party addresses the issue in any detail, it appears that the HEC Incentive Plan is not an ERISA plan.  Department of Labor regulations exclude from the definition of employee pension benefit plan "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 28 C.F.R. § 2510.3-2(c).  Following this regulation, courts have held that employee stock option plans are not employee benefit plans subject to ERISA because their purpose is "to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 189 (3d Cir. 2003); *see also Maguire v. Medtronic, Inc.*, No. 09 Civ. 0908, 2010 WL 744561, at *3-4 (W.D. Pa. Feb. 26, 2010) (stock option plan was not ERISA plan where its stated purpose was "to motivate key personnel to produce a superior return to the shareholders"); *Prieto v. Election.com*, No. 04-CV-4413, 2005 WL 3560596, at *4 (E.D.N.Y. Dec. 29, 2005) (stock option agreement was not an ERISA plan); *Kaelin v. Tenneco, Inc.*, 28 F. Supp. 2d 478, 486–87 (N.D. Ill. 1998) (restricted stock option plan was not an ERISA pension plan).  The HEC Incentive Plan fits this description.

15

Its stated purposes are "(1) to encourage employees of Hughes and its subsidiaries to contribute, both individually and in groups, to the creation of value for holders of General Motors Class H common stock and (2) to enable such employees to participate in the future success of Hughes through long-term accumulation of General Motors Class H common stock." (Matiella Decl. Ex. A, at 4.)  Nothing in the HEC Incentive Plan suggests its purpose is other than to "operate as an incentive and bonus program" designed to encourage employees to remain in GM and Hughes's employ and to improve their performance.  Thus, a claim for benefits under the HEC Incentive Plan does not, in itself, implicate ERISA preemption.

Nor does GM's promise in the Window Program that certain stock options will maintain their original expiration date serve to bring Matiella's claim for a non-ERISA benefit within the purview of the statute.  To be sure, the inclusion of this promise in a retirement incentive plan indicates GM's intent to provide Window Program participants with retirement income.  GM's declaration, however, that a benefit previously provided through a non-ERISA plan will maintain its original expiration date is not the type of undertaking "whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax*, 482 U.S. at 11.  Such a promise is more akin to a lump-sum benefit—"time instead of cash," *O'Connor*, 251 F.3d at 270—that is not subject to ERISA.  That is especially true where, as here, the obligation to provide the benefit is "triggered by a single event," *Fort Halifax*, 482 U.S. at 11, in the sense that the benefit is available only to a defined group of retirees, all of whom retire on the same date.  Indeed, administration of the benefit would seem to require little more than identifying Window Program participants with eligible stock options and notifying the stock option plan administrator that the options should retain their original expiration date, notwithstanding the participants' retirement.  Nothing about this process implicates the need for an "ongoing

administrative program." *Id.* Thus, the "facet" of the Window Program that Matiella seeks to enforce is not governed by ERISA, and his claim therefore is not preempted. Accordingly, Matiella's motion to remand is granted, and DIRECTV's motion to dismiss is denied.[3]

### B. Matiella's Request for Attorney's Fees, Costs, and Expenses

Matiella argues that DIRECTV should be ordered to pay his attorney's fees, costs, and expenses pursuant to 28 U.S.C. § 1447(c). Section 1447(c) provides, "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *Id.* "Courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Group*, 546 U.S. 132, 141 (2005). The Court finds that DIRECT had an objectively reasonable basis for seeking removal and therefore denies Matiella's request for attorney's fees, costs, and expenses.

---

[3] DIRECTV argues that removal here also is proper based on diversity of citizenship. Matiella, however, has provided an affidavit stating that he is a United States citizen who resides and is domiciled in Mexico City, Mexico. (Decl. of David Matiella ¶ 1.) "[A] suit by or against United States citizens domiciled abroad may not be premised on diversity." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990). DIRECTV, as the party seeking to assert federal jurisdiction, bears the burden of proving it, *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), and it has alleged no facts, aside from an address in Texas, to suggest that Matiella is not domiciled in Mexico. Accordingly, the Court declines to grant DIRECTV jurisdictional discovery. *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009) ("'A district court has wide latitude to determine the scope of discovery,' and is typically within its discretion to deny jurisdictional discovery when 'the plaintiff [has] not made out a prima facie case for jurisdiction.'" (citations omitted)).

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss [10] is DENIED and plaintiff's motion to remand [4] is GRANTED.  The Clerk is directed to remand this case to the Supreme Court of the State of New York, County of New York.

SO ORDERED.

Dated: New York, New York
      January **31**, 2012

 

_____
Richard J. Holwell
United States District Judge